**GENERAL ELECTRIC CO. v. AMPEREX ELECTRONIC PRODUCTS et al.**

**No. 7421.**

District Court, E. D. New York.

June 10, 1936.

Cooper, Kerr & Dunham, of New York City (John C. Kerr and George F. Des Marais, both of New York City, of counsel), for plaintiff.

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, of counsel), for defendants.

GALSTON, District Judge.

This is a patent infringement suit involving claims 1, 6, 8, and 14 of patent to Friederich, No. 1,393,520, and claims 1, 2, and 3 of patent to Meikle, No. 1,266,517.

The Friederich patent is for an inclosed arc device and the method of starting it. The application for this patent was filed October 13, 1914, and it was issued October 11, 1921. The original application for the Meikle patent was filed October 9, 1914. That application was then divided, and on January 15, 1916, the application for the Meikle patent in suit was filed, which issued May 14, 1918.

By reason of earlier German applications, the Friederich invention must be regarded as prior to that of Meikle.

It is alleged that the devices of the patents, as well as the infringing bulbs, are used in connection with rectifying alternating current for the purpose of making such current available for use in charging automobiles, radio batteries, and storage batteries, generally. Storage batteries cannot be charged with alternating current, for when the current goes in one direction it will charge the battery, but on reversal of the current the battery will be discharged. These rectifying bulbs, therefore, permit current to pass through in one direction only.

The defenses are invalidity of both patents and noninfringement. On motion made at the trial by the plaintiff, the suit as against Electronic Laboratories, Inc., was dismissed.

Taking up first the Friederich patent, the invention is described as comprising a device in which an arc is operated in an inclosed envelope between electrodes of refractory material, such as tungsten, in an indifferent atmosphere, the electrodes proportioned to be heated to incandescence. One of the objects of the invention was to operate the arc in an envelope of vapor, such as mercury vapor, to render the arc luminous at approximately atmospheric pressure.

Claim 8 of the patent may be regarded as typical. It reads: "An electric arc de-

vice comprising a sealed container, a cathode of refractory material adapted to support at incandescence an arc discharge while remaining substantially intact, a cooperating anode, a filling of material having at the operating temperature a gaseous pressure of the order of magnitude of atmospheric pressure, and means for independently heating the cathode to incandescence."

It is contended that the Friederich patent is neither shown nor described as a rectifier, and more particularly that it is not capable of such use, and that there has been no commercial acceptance thereof.

Did Friederich disclose a rectifier? Professor Webb, plaintiff's expert, admitted that before Meikle could adapt the Friederich lamp as a rectifier important changes had to be developed therein. Interrogated in cross-examination, the following important considerations developed:

"XQ40. And as shown and described, it is not adapted for use as a rectifier, is it? A. No.

"XQ41. Now, I am particularly interested in the changes, the physical structure changes that must be made in the disclosure of the Friederich patent in order to produce a rectifier. And the first one that I think you mentioned was that you had to take steps to prevent disintegration of the anode electrode, is that correct? A. Not quite correct. You will have to take steps to prevent the anode becoming sufficiently hot so it can, on the reversal of the potential, become the cathode. It is a matter of temperature. In the Friederich device, although the anode does become the cathode, it does not disintegrate because the gas pressure is sufficient to protect it from disintegration.

"XQ42. But as disclosed in the patent, then, I gather from your last statement, the Friederich structure could not be successfully used as a rectifier, is that right? A. The design of the anode is not right. The design of the cathode structure could be. As a matter of fact, they are the same in the two.

"XQ43. As shown, because I take the Friederich patent to disclose a complete structure, as shown in Fig. 1, for example, could that device act as a rectifier successfully? A. No.

"XQ44. Getting back to your suggestion as to what would have to be done in order to enable it to be used as a rectifier, you would have to make the anode so large that it could not act alternately or at any other time as a cathode, is that right? A. Yes."

Now the defendant's devices are rectifiers, and since they are coated with a mirror of magnesium they cannot be used as lamps. Thus the query is presented as to whether these devices, which might fall within a literal reading of the Friederich claims, can be held to infringe. Friederich described an arc lamp, not a rectifier; defendant sells a rectifier and not a lamp. Friederich's device cannot be used as a rectifier; defendant's device cannot be used as a lamp. The principle involved in the Friederich invention is not the principle of the defendant's device. It is, of course, true that a patentee is not compelled to set forth in his specification all possible uses of his invention; but such a concession does not help the claim of infringement urged herein. The matter would be altogether different if the Friederich device were capable of use as a rectifier. In such circumstances an omission to point out the possibility of use as a rectifier would in no sense limit his monopoly right.

Additional considerations point to noninfringement. Claims 1 and 6 refer to the pressure at the operating temperature of the device as that "high enough to give an electric discharge the characteristics of an electric arc." The reference is to a discharge between the electrodes. In claims 8 and 14, atmospheric pressure is the limitation. The pressure as measured in defendant's 6-ampere tube, at room temperature, was found to be 8 cm. This pressure would seem to be under the limitation of claims 8 and 14. The pressure of one atmosphere is 76 cm. No evidence is given as to the atmospheric pressure of the 15-ampere tube.

Since Friederich was interested in developing a lamp, he prescribed a relatively high-pressure range. Meikle, who wanted a rectifier, saw the necessity of a low range. Professor Webb said of Meikle's object:

"Therefore he had to choose a range of pressure in which the voltage drop between terminals was as small as possible, because a rectifier which it was necessary to use to get a certain result should not consume more power than was absolutely necessary.

"Meikle, therefore, had to go to a lower range of pressures. The lower the

440

pressure the less the power consumption, and furthermore, the lower the pressure the easier it is to prevent reversal of the arc" etc.

■ It is difficult to see how the defendant can be held to infringement of both of these patents. There has been such a departure from the principle of the Friederich invention as defined and disclosed in his specification as to defeat the effort to apply a literal application of his claims to the alleged infringing devices. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S.Ct. 707, 42 L.Ed. 1136; Cadwell et al. v. Firestone Tire & Rubber Co. (D.C.) 13 F.(2d) 483.

■ The Meikle patent. This patent describes a rectifier. The inventor states: "The present invention relates to the rectification of alternating current of a current and voltage range comparable to the range of the mercury arc rectifier and is embodied in a device having an electron-emitting cathode, and an anode or anodes."

The claims in issue read:

"1. A rectifier comprising the combination of a sealed envelop, a refractory cathode operable at a temperature of at least about 2000° C., an anode having a heat-dissipating capacity great enough to be operable below the temperature at which appreciable electron emission occurs, and a filling of argon having at the operating temperature of the device a pressure materially above one millimeter of mercury.

"2. A rectifier comprising the combination of a sealed envelop, a tungsten cathode, means for heating said cathode to incandescence, an anode having a heat-dissipating capacity great enough to be operable below the temperature at which appreciable electron-emission occurs, and a filling of argon having at the operating temperature of the device a pressure of at least about one centimeter of mercury.

"3. A rectifier comprising the combination of a sealed envelop, a refractory cathode adapted to emit electrons, an anode having a heat-dissipating capacity great enough to be operable below the temperature at which appreciable electron emission occurs, and a quantity of argon in said envelop having at the operating temperature of the device a pressure sufficiently high to give to an electrical discharge emanating from the cathode when at incandescence the characteristics of an electric arc."

To prove invalidity of the Meikle patent, reliance is had on but two patents of the prior art; the Friederich patent in suit and letters patent to Kruh, No. 1,032,194. Comparing, for example, claim 2 of the Meikle patent in suit with Friederich, we find the following elements present in the Friederich device:

(1) A sealed envelope.

(2) A tungsten cathode. (Friederich says the electrodes in the simplest type of lamp shown in Figs. 1–7, inclusive, include an electrode 6 consisting of tungsten, or other suitable material, having an electron emissivity great enough to support an arc-like discharge at a temperature at which the electrode remains sufficiently intact or unvaporized, etc.)

(3) Means for heating the cathode to incandescence.

(4) An anode.

(5) A filling of argon. (Friederich says: "The envelop 1 is filled with a gas inert with respect to the metal constituting the electrodes. Various indifferent gases such as nitrogen, argon, or a mixture of these gasses may be used for this purpose," etc.)

Professor Webb was asked by the court:

"The Court: Isn't it possible to design a Friederich device so as to make it available as a rectifier?

"The Witness: In order to make it available as a rectifier, we have to change the design of the anode but not of the cathode. The anode must be sufficiently large, and will not get hot, so that it could function as a cathode on the reversal of the potential.

"The Court: Then is that in your judgment the distinction between these two patents, the sizes of the respective anodes?

"The Witness: Yes, and also the refinements as regards the construction and operation," etc.

It would seem, therefore, that structurally the only difference between Meikle and Friederich is in the use by Meikle of a larger anode.

It may be remarked that there is nothing in the Meikle claims about the size of the anode. The only limitation is that it should have a heat dissipating capacity great enough to be operable below the temperature at which appreciable electron-emission occurs.

Of the two electrodes described by Friederich, one, the electrode 6, is said to be, as is quoted above, of tungsten, having an electron emissivity great enough to support an arclike discharge at a temperature at which the electrode remains substantially intact or unvaporized. The other, or co-operating electrode, is said to be either of a small metalic globule, as shown in Fig. 1, or of a small rod, as shown in Fig. 2, or of a closely coiled spiral, as shown in Fig. 3.

So far as the shape of the Meikle electrode is concerned, the flat disk is disclosed in the Langmuir patent, No. 1,241,-246. These are described by Langmuir as "plate-shaped anodes 15, 16, consisting of a highly refractory metal such as tungsten."

The patent to Kruh weighs heavily against the plaintiff in respect to both the Friederich and the Meikle patents. Kruh's invention relates to a vapor electric apparatus for producing light, and rectifying alternating currents. There are shown a cathode, cathode heater, a pool of mercury, and two anodes. The cathode may be of tungsten. The anode 2 may also be of tungsten. In the operation of the device, the heater is first turned on, heats the mercury in the pool and causes it to vaporize. An arc forms between the cathode and the anode 15, and after the device becomes sufficiently warm, a switch can be opened and the arc reaches the anode 2. As shown in Fig. 1, the device is used for a light. In the form shown in Fig. 2, the device is used as a rectifier. In this form the anodes are arranged differently from the arrangement shown in Fig. 1. This illustration is of a full-wave rectifier, and is comparable with Fig. 1 of the Meikle patent in suit. The inventor states: "The helix 23, being maintained in a luminous condition, results in a unidirectional flow of current through the tube and thus enables continuous rectification of the alternating current to take place, whereby rectified current is supplied to the work circuit 29. An inductance 31 in the direct current circuit may be used for smoothing out the direct current."

· The gas suggested is mercury vapor. There is no specific instruction given in this patent about pressure. Kruh says, referring to the filament: "If the helix be brought to a red heat it will give off negative ions or negative electricity and render the interior of the container 1 conductive for current."

Also: "It should be mentioned that helix 10 is or may be kept glowing all the time. The oxid coating, when heated, apparently has the power of readily emitting negative ions or negative electricity, and it does this at a relatively low temperature. These negative ions or this negative electricity is instrumental in transferring current through mercury vapor in the tube and thereby produces a brilliant illumination without any considerable evaporation of mercury, and at the same time with apparently very high efficiency."

Professor Webb admitted that heating the filament of the Kruh device to redness causes some of the mercury to evaporate and to form a vapor, and the production of an arc between the filament and the anode, if the vapor pressure is sufficient to sustain an arc. This will result if the temperature of the filament is sufficiently high. The process of discharge from the filament and heating of the mercury continues until a state of balance is reached. Professor Webb was asked:

"XQ248. And that process is going to continue until a state of balance is reached? A. Until a state of balance is reached.

"XQ249. And when that state of balance is reached, will you or will you not have an arc discharge between those two electrodes? A. The discharge is probably an arc when that state of balance is provided. It depends entirely upon how big the current is. He specifies the current is fairly small. So until you specify the magnitude of current, I cannot tell you just what will happen in a tube of that kind.

"XQ250. And I think you gave the temperature of the helix 10 as in the neighborhood of 1,000 degrees Centigrade. A. He specifies at red heat. As I recall the books on pyrometry, they always give bright red heat as about 1,000 degrees."

Under persistent cross-examination, the witness admitted that when the filament was heated to 1,000 degrees the temperature of the surface of the mercury might be 100 or 150 degrees, and at a temperature of 150 degrees the vapor pressure of the mercury would be 2 or 3 millimeters.

The article by Albert W. Hull, entitled, "Gas-Filled Thermionic Tubes," was introduced by the plaintiff. Professor Webb, under cross-examination, admitted that passages in this article mean that if you make the cathode sufficiently large so that its emission will be at least equal to or greater

than the emission that is desired, there will be no troublesome disintegration of the cathode. The article contains this passage: "With this precaution the immunity to disintegration or sputtering is quite general, any type of cathode can be operated without disintegration in any inert gas, at any pressure between .001 mm. and 5 cm., and with any current up to the maximum vacuum electron emission of the cathode."

Under the conditions of operation specified in the Kruh specification, it follows that a pressure will be developed above the minimum limit specified by both Friederich and Meikle.

I conclude that the Kruh patent is an anticipation of Meikle; and in the state of the art, there was but a laboratory advance over Friederich involving no invention.

For the foregoing reasons, the complaint must be dismissed. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.